# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **STEVEN M. EICKEN,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | **CIVIL ACTION NO. H-05-4139** |
| | § | |
| **USAA FEDERAL SAVINGS BANK and** | § | |
| **USAA SAVINGS BANK,** | § | |
| | § | |
| **Defendants.** | § | |

## <u>MEMORANDUM AND ORDER</u>

Pending before the Court are Plaintiff's Motion for Partial Summary Judgment, Defendants' Motion for Summary Judgment, Defendants' Motion to Strike and Objections to Plaintiff's Summary Judgment Evidence, and Defendants' Motion to Strike Attempts to Change Deposition Testimony on Errata Sheets.   After considering the parties' filings and the applicable law, the Court finds that Defendants' Motion to Strike and Objections to Plaintiff's Summary Judgment Evidence, Docket No. 75, should be **DENIED.**   Defendants' Motion to Strike Attempts to Change Deposition Testimony, Docket No. 74, is **GRANTED IN PART, DENIED IN PART.**   Defendants' Motion for Summary Judgment, Docket No. 71, is **GRANTED IN PART, DENIED IN PART.**  Plaintiff's Motion for Partial Summary Judgment, Docket No. 68, is **DENIED.**

## I.   BACKGROUND

This case arises from alleged violations by Defendants of the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 et seq., and the Fair Credit Billing Act ("FCBA"), 15 U.S.C. §§ 1666 et seq.

_Plaintiff's Claims_

The following undisputed facts are drawn primarily from Plaintiff's First Amended Complaint.  Plaintiff Steven Eicken, who is employed as a letter carrier, applied for a charge account owned by Defendant USAA Savings Bank ("USAA SB") in 1991.  After receiving his credit card, Plaintiff used it to make purchases, and received monthly statements from USAA SB.  Plaintiff never paid the total amount due, but continually carried a balance on his account.

On November 18, 2004, Plaintiff sent a letter titled "Notice of Billing Error" to the USAA SB legal department.  The letter states that "[p]ursuant to 15 U.S.C. 1666, I am writing you . . . within sixty days of receiving statements of my account dated 10/8/2004 and 11/8/2004 in connection with extensions of consumer credit.  I hereby provide you notice that I believe said statements contain errors in the total amount you allege to be due, and other more specific items, as laid out more completely below."  As to the source of these supposed errors, the letter refers to Plaintiff's "belief that you failed to give all the proper disclosures required by law to me prior to opening this account, and additional disclosures since then.  Because you failed to provide these disclosures, the account could not legally be opened and I should not be responsible for the payment of interest, fees or other finance charges."

In a subsection detailing errors "pursuant to 15 U.S.C. 1666(b)(1) and (5)," the letter "disputes the accuracy" of "the current balance [then $8,717.70], the amounts and payments due and all finance charges and other fees charged since this account was opened."  A subsequent section headed "Billing Error Pursuant to 15 U.S.C. 1666(b)(2)" states that "if the account was not able to be opened properly because of your failure to

give the disclosures, then the amount of the indebtedness is called into question." The letter then requests the following "documentary evidence of indebtedness": 1) copies of all records of Plaintiff's written and signed authorizations for all purchases for which an extension of consumer credit is claimed to have been made; 2) for any claimed extension of consumer credit without Plaintiff's written authorization, a copy of all records of evidence of any authorization by Plaintiff, such as use of his PIN or other identifying information; 3) for any claimed extension of consumer credit with no proof of authorization, a statement by USAA SB of the factual and legal basis for the claim; 4) copies of documents showing that all required disclosures were given to Plaintiff at all relevant times, including evidence that any such disclosure was made to Plaintiff, by whom, when, how and where; 5) Plaintiff's original cardholder agreement, as well as any amendments made thereto; 6) an accounting of all interest, fees, or other charges assessed to the account since it was opened; 7) clarification of the amount(s) due pending the resolution of the billing errors, and when the amounts will need to be paid; and 8) any other documents upon which USAA SB may rely to support its claim that Plaintiff is indebted in the amount alleged.

Between December 2004 and September 2005, Plaintiff mailed eight more "notices of billing error" to USAA SB. Each letter is virtually identical to the first, updating only the dates of the account statements allegedly being disputed and the current balance and minimum payment due. Defendant USAA SB never responded directly to the substance of these letters – that is, to Plaintiff's allegations of billing errors and requests for documents. However, USAA SB began sending its own letters to Plaintiff in November 2004, expressing concern about his past due account. On November 29, 2004,

USAA SB wrote, "We have given you every opportunity to settle your seriously past due USAA credit card account. We are willing to establish any reasonable payment arrangements to remedy your delinquency, but we must have your immediate cooperation." Subsequent correspondence informed Plaintiff of the adverse credit actions that could be taken against him due to his failure to make payments, and invited discussions regarding settlement. Plaintiff's only response, however, was another series of letters (also virtually identical to one another) setting forth his position that the warnings sent by USAA SB did not resolve the claimed billing errors. Further, the letters state that "my billing error remains unresolved and my entire balance is still in dispute, as you have not corrected the error, performed a reasonable investigation, sent adequate written clarification or sent copies of the requested documentary evidence."

Plaintiff filed the instant lawsuit in December 2005. The suit alleges that Defendants committed numerous violations of the TILA, the FCBA, and the FCBA's implementing regulation (12 C.F.R. § 226.13, or "Regulation Z"). Plaintiff argues that once he began sending his "notices of billing error," the FCBA obligated Defendants to respond to them, and barred Defendants from any other communications or actions regarding his account. More specifically, Plaintiff claims that Defendants unlawfully failed to send written acknowledgments of his error notices; did not correct his account; did not perform a "reasonable investigation"; did not send "written explanations or clarifications," as requested; failed to provide documentary evidence, as requested; initiated collection actions in the form of monthly statements, letters and email messages, and telephone calls; restricted and ultimately closed his account; and reported Plaintiff to various credit agencies. In all, Plaintiff contends that Defendants committed 180

violations of the relevant statutes and regulations.  None of the claims in the instant lawsuit, however, arises from any alleged *billing* error, including the errors asserted in the "notices" that Plaintiff sent to USAA SB.

Plaintiff claims that he is entitled to statutory damages under the TILA of $1000 per violation, for a total of $180,000.  Further, Plaintiff seeks attorneys' fees and costs, as well as injunctive relief (ordering that Defendants correct the negative entries on his credit reports, reopen Plaintiff's account, resume accepting monthly minimum payments, and credit any fees or charges assessed in violation of the FCBA).

*Defendants' Counterclaim*

Defendants deny that they violated the TILA, FCBA, or Regulation Z, and counterclaim for sums owed by Plaintiff for goods and services he purchased using his USAA SB credit card.  Defendants also present a much broader set of facts surrounding the instant dispute, examining in more detail the history of Plaintiff's USAA SB account.[1]

By early 2004, Plaintiff had amassed substantial debt on a variety of credit cards, totaling almost $54,000.  Plaintiff's last statement reflecting purchase activity on his USAA SB card is dated July 9, 2004.  During that purchase period, Plaintiff charged $3,835.79, most of which – $3,033.35 – was paid to a merchant called "Debt Relief Services" ("DRS").  DRS was in the business of selling advice and assistance to individuals saddled with large amounts of credit card debt.  Plaintiff does not dispute that he purchased and made use of DRS materials starting in July 2004.

---

[1] These facts are culled primarily from Defendants' Motion for Summary Judgment, which in turn draws heavily on Plaintiff's deposition on January 30, 2007.

On July 26, Plaintiff sent USAA SB a letter that he obtained from DRS, claiming with regard to his most recent statement that "[t]here appears to be a billing error which needs to be corrected."  The letter requested four types of documents: all past billing statements, the original cardholder agreement, a report of all payments USAA had received on the account, and "the bank's original bookkeeping journal entry representing a deposit of funds for advancement of money and/or credit for the above account." Further, the letter states that "[u]ntil your company provides verified documentary evidence requested in this account, I hereby dispute the amount in its entirety," and requests that USAA report Plaintiff's account as "disputed" to credit reporting agencies. Defendants did not take any action responsive to this letter, and Plaintiff appears never to have pursued it further.

The next day (July 27), Plaintiff sent another DRS letter to USAA, this time declaring his "intent to tender partial payment and other consideration as satisfaction in full" of his account, and promising further correspondence and a check.  Plaintiff sent the follow-up letter, also obtained from DRS, on August 4.  The letter was titled "Settlement Agreement between Steven Eicken and USAA Credit Card Services," and was accompanied by a check for twenty-five dollars.  Under the purported "agreement," "[a]ny use of the Check by you shall constitute your acceptance of the terms of this Agreement and shall have the same force and effect as if it were sent to your proper address, and one of your senior officers gave it prior written approval."  The letter and check were sent to a lock box, where, as a matter of practice, the check would be automatically cashed without review.  Both parties agree that Plaintiff and USAA SB had never actually discussed or negotiated any settlement.

The "settlement" letters also referenced the possibility of arbitration "at the National Arbitration Council or Blue Ridge Arbitration."  Plaintiff sent a DRS-authored demand for arbitration on September 13, advising USAA SB that they had "previously agreed to resolve this dispute with me in binding arbitration" with Blue Ridge.  There is no evidence in the record that any such arbitration was actually agreed to or commenced; Plaintiff states in his discovery responses that "[t]he arbitrations with Blue Ridge were never completed.  To the best of my knowledge, these were filed in late 2004."  In any event, Plaintiff has not pursued the arbitration issue further.

In October 2004, DRS began promoting yet another strategy – using new billing error notice letters, designed to trigger creditors' obligations under the FCBA – to its customers.  In a letter titled "Critical Update for DRS Clients," DRS writes that "[w]e constantly are looking for new or refined strategies to counter the illegal actions of the banks."  The "new strategy" involved "suing the banks in Federal Court for their blatant violations of consumer protection statutes under the Truth in Lending Act.  Depending on the number of violations and the size of your accounts, you may recover amounts far in excess of your alleged balances."  Evidently persuaded to try this new approach, Plaintiff began sending the series of "notice" letters to USAA SB, culminating in the instant litigation.[2]

None of the above facts is in dispute; during his deposition on January 30, 2007, Plaintiff freely admitted having followed the various strategies proposed by DRS, and

---

[2] Plaintiff appears to have deviated from the DRS programs only once, when he sent a non-DRS letter to USAA SB on April 7, 2005.  The letter states only, "I would like to start payments and get current.  Please let me know what it would take to get current??  Enclosed is a check for $100."  Plaintiff never did "get current," however, and resumed sending the DRS billing error "notices" soon after.

using DRS-supplied form letters to challenge his USAA SB account.[3]  Aside from the form correspondence, Plaintiff also acknowledged receiving other types of advice offered by DRS.  For example, DRS employees repeatedly advised Plaintiff as to how best to avoid service of process, including not accepting any certified mail, denying that he lived at his address if a process server came to the door, and using (and frequently changing) P.O. boxes.  Plaintiff was further counseled to move his money out of accounts maintained at card-issuing banks, and to avoid making payments on his credit cards, in order to maximize the number of FCBA or TILA violations his creditors might commit in attempting to collect on his accounts.  Plaintiff also admitted during his deposition that DRS provided him with a telephone script and instructions to use in case a creditor called.  Finally, during the course of the present litigation, neither party has identified any actual underlying billing errors on any of Plaintiff's USAA account statements.

At most, then, the parties dispute Plaintiff's motives and state of mind in using the DRS materials, and whether his well-documented efforts to escape his debt obligations are even relevant.  Plaintiff argues that they are not.  He contends that, once Defendants failed to respond substantively to his error notices, they were in violation of the TILA and FCBA, regardless of Plaintiff's motives and prior conduct, and regardless of whether there actually were errors in his statements.  Defendants counter that Plaintiff's letters did not constitute valid billing error notices for a number of reasons, including his lack of belief that errors actually existed; therefore, his state of mind and previous attempts to avoid his debt are directly relevant.  Defendants counterclaim for the

---

[3] Plaintiff's discovery responses indicate that he has sent similar letters alleging TILA and/or FCBA violations to American Express, Chase, Bank One, and NextCard, and has filed TILA and/or FCBA proceedings against Advanta, Discover, MBNA, Household Credit Services, Chase Bank, Bank One, NextCard, and American Express.

amount due on Plaintiff's USAA SB account and attorney's fees, arguing that he breached his credit card contract and has been unjustly enriched.

Defendants now move for summary judgment on all of Plaintiff's claims. Plaintiff moves for partial summary judgment on his FCBA claims.

## II.  MOTIONS TO STRIKE

The Court first addresses Defendants' motions to strike.  Defendants move to strike and object to certain items included in Plaintiff's summary judgment evidence – namely, Plaintiff's own affidavit dated April 19, 2007, and two affidavits submitted by non-party individuals, Robert A. Carpenter and Denise Davis.  Defendants object that the April 19 affidavit is a "sham affidavit," submitted solely for the purpose of countering Plaintiff's damaging deposition testimony.  With regard to the Carpenter and Davis affidavits, Defendants assert that neither Carpenter nor Davis were properly disclosed as witnesses pursuant to Federal Rule of Civil Procedure 26, and that the affidavits contain impermissible legal conclusions, opinions, speculation, and hearsay.

In the Court's view, Defendants' objections as to Plaintiff's affidavit go to its weight, not its admissibility.  *E.g.*, *Williamson v. United States Dep't of Agriculture*, 815 F.2d 368, 383 (5th Cir. 1987) (finding that the district court did not improperly consider inadmissible portions of affidavits and writing that "[t]hose portions of affidavits that do not comply with [the requirements of Federal Rule of Civil Procedure 56(e) are entitled to no *weight*.") (emphasis added).  With regard to the Carpenter and Davis affidavits, Plaintiff has submitted documentary evidence that those two witnesses were, in fact, disclosed to Defendants.  The Court is ill-situated to decide this discovery dispute after the fact, and therefore finds that Defendants' objections again go to weight, not

admissibility.  Defendants' motion to strike this summary judgment evidence is therefore denied, and their objections overruled.  The Court does note the general irrelevance of the Carpenter and Davis affidavits, and affirms that it has not relied on them in reaching any conclusions contained herein.

Defendants also move to strike Plaintiff's attempts to change his deposition testimony.  After he was deposed on January 30, 2007, Plaintiff submitted errata sheets purporting to change answers to forty-five separate questions.  Virtually all of the changes significantly alter the substance of the original answer; for example, changing "Correct" to "No," or "I don't know" to "Yes, I have."  Plaintiff did not submit any explanation for the changes along with the errata sheets.  Defendants ask the Court either to strike the changes or not to permit the changes to create a fact question precluding summary judgment, and request the opportunity to re-depose Plaintiff about the alterations.  In response, Plaintiff points to an affidavit dated May 9, 2007, in which he states that he became confused during the deposition and made mistakes, and to his testimony near the end of his deposition that he had made mistakes and had not been able to correct them.

The Fifth Circuit has not defined the permissible scope of changes to deposition testimony, and courts have taken a variety of approaches.  *See, e.g.*, *Greenway v. Int'l Paper Co.*, 144 F.R.D. 322 (W.D.La. 1992) (holding that Rule 30(e) permits only the correction of typographical and transcriptional errors); *Reilly v. TXU Corp.*, 230 F.R.D. 486 (N.D. Tex. 2005) (adopting a broad reading of Rule 30(e) and allowing "legitimate" substantive changes, accompanied by a statement of reasons for the alterations); *Hambleton Bros. Lumber Co. v. Balkin Enters.*, 397 F.3d 1217 (9th Cir. 2005) (affirming

the lower court's granting of a motion to strike deposition changes, because the changes were "akin to a sham affidavit" and cannot be offered solely to create a material factual dispute).  Under even the permissive approach taken in *Reilly*, Plaintiff's changes in the instant case would be highly suspect, given that the majority of the forty-five changes *reverse*, not merely supplement, the original answer.  The Court also acknowledges Plaintiff's failure contemporaneously to submit reasons for the alterations, and his *ex post* explanations – in sum, that he was confused – are unpersuasive.

However, Plaintiff's original answers will remain part of the record, and in the Court's view, Defendants' ability to use those answers to impeach Plaintiff or attack his credibility constitutes an adequate remedy.  *See Innovative Mktg. & Tech., L.L.C. v. Norm-Thompson Outfitters, Inc.*, 171 F.R.D. 203, 205 (W.D. Tex. 1997) ("the original answers to the deposition would remain as a part of the record and could be read at trial . . . The witness who changes his testimony on a material matter between the giving of his deposition and his appearance at trial may be impeached by his former answers . . .").  Therefore, the motion to strike is denied.  However, the Court grants Defendants' request to obtain additional testimony from Plaintiff, at Plaintiff's expense, regarding the changes.  *See* 8A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2118 (2d ed. 1994) ("If changes are made, this has the effect of making the examination uncompleted, and the parties ordinarily may then examine the witness further in the light of the new answers.").  Finally, while not expressly adopting a "sham affidavit" analysis, the Court does view Plaintiff's deposition changes as akin to an after-the-fact affidavit, and has weighed them accordingly.

## III.  MOTIONS FOR SUMMARY JUDGMENT

### A.  Summary Judgment Standard

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented.  FED. R. CIV. P. 56(c).  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted).  A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party.  *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000).  The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Id.*

### B.  Analysis

#### 1.  Defendants' Motion for Summary Judgment

Defendants move for summary judgment on all of Plaintiff's claims, arguing that Plaintiff should take nothing and that USAA SB is entitled to the balance owed on Plaintiff's credit card account.  For the below reasons, the Court finds that the letters sent by Plaintiff to Defendant USAA SB did not constitute valid notices of billing error.  Therefore, in failing to respond to the letters, Defendants did not violate the TILA, FCBA, or Regulation Z, and are entitled to summary judgment on those claims.

_Sixty-Day Requirement_

The Court first finds that the nine letters sent by Plaintiff to Defendant USAA SB between November 2004 and September 2005 did not constitute valid billing error notices because the claims of error therein were not timely made.  Under the Fair Credit Billing Act, a creditor is obliged to respond to a notice of billing error only if it is received within sixty days after the creditor transmitted the account statement that ostensibly reflects the error.  15 U.S.C. § 1666(a) (2006).  The FCBA's implementing regulation, Regulation Z, further specifies that the sixty-day period runs from "the _first_ periodic statement that reflects the alleged billing error."   12 C.F.R. § 226.13(b)(1) (emphasis added).  The letters sent by Plaintiff, purporting to be FCBA notices of billing error, do not comply with these requirements.

Each letter specifically references the two most recent account statements sent by USAA SB, ostensibly creating a sixty-day window preceding each letter.  However, the billing errors alleged to have occurred and the specific amounts challenged in each letter clearly fall well outside that window.  In short, Plaintiff challenges every finance charge or other fee ever assessed against the account since its opening, and any amount calculated to include those fees.  For example, the letters allege that Plaintiff "should not have been charged finance charges or fees _for the history of this account_," therefore rendering objectionable "the current balance, the amounts and payments due and all finance charges and other fees charged _since this account was opened._"  Defs.' Mot. Summ. J., App. at Ex. 35 (emphases added).  The letters claim that Plaintiff's account "could not legally be opened" due to USAA SB's alleged failure "to give all the proper disclosures required by law to me _prior to opening this account_," _id._ (emphasis added),

further underscoring the *ab initio* nature of the billing errors asserted. The documents requested in the letters also illustrate the time scale and magnitude of the errors asserted. The letters seek records relating to all purchases and extensions of credit ever made using the account, documentation of all disclosures ever provided, the original cardholder agreement and any amendments ever made, and an accounting of all interest, fees, or other charges assessed since the account was opened.

Plaintiff does not dispute that his USAA SB account was first opened in 1991. Defendants submit documentary evidence showing that finance charges were assessed on the account as early as January 1999. Defs. Mot. Summ. J., App. at Ex. 70. Every statement from January 2002 to September 2004, after which Plaintiff began to send his billing error "notices," reflected a finance charge. *Id.* at Exs. 72-103. By November 2004, when he sent the first DRS-authored billing error letter, Plaintiff's opportunity to challenge every finance charge or other fee (as well as any amount calculated to include that fee) for the history of his account had clearly passed, under the sixty-day requirement described by the FCBA and Regulation Z.

Plaintiff argues that the letters met the sixty-day requirement because each letter references (and complains of) errors only in the two most recent statements. For example, each letter includes language stating that Plaintiff disputes the accuracy of 1) the current balances listed on the two most recent statements, 2) the finance charges on those statements, and 3) the minimum payments due on those statements. *E.g.*, Defs.' Mot. Summ. J., App. at Ex. 35. This language is contradicted, however, by the other features of the letters discussed above: the specific challenges to all fees and charges assessed since the account was opened, the suggestion that the account was invalid from

14

its inception, and the requests for documents relating to the entire life of the account. When read as a whole, the letters plainly assert errors and challenge amounts outside the allowed sixty-day time period.  Even with regard only to the alleged irregularities in the two most recent statements, it is clear from the letters (and from a basic exercise of logic) that these errors could not be resolved without reexamining and undoing parallel errors in dozens of older statements.  Therefore, the portions of the letters that purport to restrict the relevant time scale to sixty days are unavailing.  The plain language of the letters demonstrates that the errors asserted therein fall outside the sixty-day window allowed by the FCBA and Regulation Z.

Plaintiff also argues that "[w]hile previous statements contained finance charges, they did not contain a 1666(b)(2) billing error because the obligor did not request clarification of the amounts."  A Section 1666(b)(2) billing error is "[a] reflection on a statement of an extension of credit for which the obligor requests additional clarification including documentary evidence thereof."  Therefore, Plaintiff essentially contends that because each letter, in asking for documentary evidence and clarification, only references the two most recent statements, there are simply no 1666(b)(2) billing errors outside the sixty-day window preceding each letter.  Again, however, Plaintiff's assertion is undermined by the plain language of the letters.  Each letter requests additional "clarification including documentary evidence thereof" for charges and extensions of credit dating back to the opening of the account, including documentation of every purchase and extension of credit ever made on the account and an accounting of all interest, fees, or other charges ever assessed to the account.  Therefore, there are "reflection[s] . . . of an extension of credit for which the obligor requests additional

clarification" on dozens of statements older than the ones referenced in the letters, and well outside the sixty-day window for sending a notice of billing error.

The Court is also unpersuaded by Plaintiff's assertion that Section 1666(b)(5) errors ("computation error[s] or similar error[s] of an accounting nature") appeared for the first time on the statements referenced specifically in the letters, and therefore within the sixty-day time period. According to Plaintiff, the computation errors consist of the inclusion of invalid finance charges and fees in the total balance and minimum payment due. As already discussed, however, the letters dispute "all finance charges and other fees charged since this account was opened," therefore affecting the calculation of the monthly balance and minimum payment amount from the account's inception. Again, it requires only a rudimentary exercise of logic to recognize that the alleged computation errors in each statement could not be resolved without addressing parallel errors in all previous statements, well outside the sixty-day window.

Finally, Plaintiff argues that the FCBA itself "merely requires [that] the billing error notice must be received within 60 days of the transmittal of the periodic statement reflecting the alleged billing error, not the first statement," and that the Court should ignore the "first statement" requirement set out in Regulation Z, as "it is manifestly contrary to the statute." Pl.'s Resp. 20. According to Plaintiff, the notion that he should have disputed the first statement that contained a finance charge is "ridiculous." *Id.* at 21. The Court observes initially that Plaintiff provides no authority for the proposition that the "first statement" requirement of Regulation Z conflicts with the FCBA, and is therefore invalid. It is also not at all apparent to the Court that requiring Plaintiff to dispute erroneous finance charges immediately after they appear is ridiculous. A timely

16

challenge to the finance charges would certainly be more sensible than Plaintiff's current approach – disputing, years after the fact, the accuracy of every finance charge and fee ever assessed and the calculation of the total balance and minimum payment based thereupon, while *purporting* only to challenge the fees and charges assessed after an arbitrarily chosen point in time (when Plaintiff began to send the billing error letters).[4] The "first statement" requirement also helps to ensure that the documents associated with a disputed charge will be readily available.  Under 12 C.F.R. § 226.25(a), creditors are required to maintain documents showing compliance with Regulation Z for two years after the date disclosures are required to be made or action is required to be taken. Letters such as Plaintiff's, which contest charges and request documents that are potentially over thirteen years old, could very well be impossible to respond to, even for a creditor who is fully compliant with the regulations governing document retention under the FCBA.

Because Plaintiff's letters to Defendant USAA SB did not comply with the sixty-day requirement set out in the FCBA and Regulation Z, and because Plaintiff has not demonstrated why the "first statement" rule of Regulation Z should not apply, the Court finds that the letters did not constitute valid billing error notices under the FCBA. Therefore, Defendants were under no obligation to respond, and did not violate the TILA, FCBA, or Regulation Z in not doing so.

---

[4] A hypothetical illustrates the problematic nature of Plaintiff's argument, and the type of situation that the "first statement" rule prevents.  On the day that he opens a new credit card account, an obligor is incorrectly charged for a $1,000 purchase, but does not dispute it.  The obligor never pays off the balance on his account, and a finance charge is assessed against him every month.  The incorrect $1,000 charge is then calculated into, and affects, every subsequent monthly statement of the total balance, minimum amount due, and finance charge.  Twenty years later, the obligor discovers the $1000 error and disputes the accuracy of every finance charge and fee assessed over the life of the account.  He claims, however, that his precise  complaint extends only to the finance charge, total balance, and minimum payment due on the most recent statement.  In order to recalculate those items even on the most recent statement alone, the creditor would have to go back twenty years and reexamine every previous monthly statement.

*Plaintiff's Lack of Belief*

In the alternative, the Court is skeptical that Plaintiff has created a genuine dispute of material fact on an essential element of his FCBA claim: his belief that his USAA account statements actually contained errors.

Under the FCBA, a notice of billing error must "indicate *the obligor's belief* that the statement contains a billing error and the amount of such billing error," and "set[] forth the reasons for *the obligor's belief* (to the extent applicable) that the statement contains a billing error."  15 U.S.C. § 1666(a)(2)-(3) (emphasis added).  In the Court's view – and recognizing the existence of other judicial opinions suggesting the contrary – this language plainly requires an obligor actually to possess a belief, even if that belief is ultimately shown to be incorrect, that a particular billing statement contains an error.  Plaintiff contends that "the FCBA does not require the obligor to **have** a belief – only to **indicate** a belief."  Pl.'s Resp. 6.  However, Plaintiff's interpretation sidesteps the precise wording of the statute, which does not refer to *a* belief, but, using the possessive, to *the obligor's* belief.

Plaintiff also argues that there is no "good faith" requirement in the FCBA, a point that has been made by other courts addressing FCBA cases (although the Court is unaware of any circuit-level holding on this issue).  *See, e.g.*, *Esquibel v. Chase Manhattan Bank USA, N.A.*, 487 F. Supp. 2d 818, 827 (S.D. Tex. 2007) ("The bottom line is that the court is unwilling to read a subjective, good-faith requirement into an objective statutory scheme."); *Raney v. First Nat'l Bank of Nebraska, Inc.*, No. 06-8-DLB, 2006 WL 2588105, at *3 (E.D. Ky. Sept. 8, 2006) ("Plaintiffs' beliefs as to why the billing error occurred is not dispositive to their FCBA claim."); *Kurz v. Chase*

18

*Manhattan Bank*, 273 F. Supp. 2d 474, 478 (S.D.N.Y. 2003) ("TILA does not explicitly require that the obligor's complaint arise out of a good faith belief that he does not owe the amount specified.").[5]  An explicit requirement of a "good faith belief," however, would seem to be unnecessarily redundant, given that the ordinary definitions of "belief" already embrace a state of mind resembling "good faith."  *See, e.g.*, *Merriam-Webster's Collegiate Dictionary* 162 (10th ed. 1998) ("conviction of the truth of some statement or the reality of some being or phenomenon, especially when based on examination of evidence"); *Black's Law Dictionary* 164 (8th ed. 2004) ("[a] state of mind that regards the existence of something as likely or relatively certain").[6]  When interpreting a statute, courts must give words their ordinary or natural meaning.  *See e.g.*, *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004) (internal quotation marks omitted); *United States v. Hubbard*, 480 F.3d 341, 348 (5th Cir. 2007).

Defendants have introduced substantial evidence demonstrating that Plaintiff never possessed a belief that his USAA account statements contained errors, much of it comprised of Plaintiff's own deposition testimony.  First, although Plaintiff began using DRS-authored materials in an attempt to escape his debt in July 2004, he admitted during his deposition that he had "no previous notion or thought about disclosures" until DRS began to promote the new billing error notice scheme in October 2004.  Defs.' Mot. Summ. J., Dep. of Steven Eicken 190-91 [hereinafter "Eicken Dep."; all page numbers refer to the deposition itself, not to the numbering of the appendix] ("Q: And that's when

---

[5] Certain facts differentiate this case from *Kurz*.  In *Kurz*, the obligor examined his account statements and actually found technical discrepancies, which he then timely reported to his creditor via FCBA billing error notices.  In the instant case, the Court has already ruled that Plaintiff's billing error "notices" were untimely; neither party has been able to identify any actual billing error, however technical, in Plaintiff's account statements; and Plaintiff has admitted that he did not personally review his account to look for errors.

[6] Working from these definitions, while one could imagine a reckless or uninformed belief, it is virtually impossible to conceive of a "bad faith belief" as anything other than a misrepresentation or prevarication.

they started talking about a bank's failure to disclose on the third page of Exhibit 30, right?  A:  Correct.  Q:  And that's the first you had ever heard of that, right?  A:  Correct.").  Plaintiff also admitted that he didn't know what disclosures he had received from USAA SB, and that he had never re-examined his account statements to determine whether the finance charges were not being calculated correctly.  Eicken Dep. 38, 73-74.  In fact, Plaintiff listed all of his credit accounts on his initial DRS Client Data Form, intending to challenge each account "regardless of the knowledge that [he] did or didn't have about what [he] did or didn't receive" when he first opened his accounts.  *Id.* at 181-186; Defs.' Mot. Summ. J., App. at Ex. 1 (DRS Client Data Form listing all of Plaintiff's credit accounts).

Indeed, Plaintiff admitted *numerous times* during his deposition that he did not know what disclosures he may or may not have received.  *E.g.*, Eicken Dep. 214-216 ("Q:  And so you can't truthfully say that someone failed to give you additional disclosures after the account was opened, because you don't know one way or the other what happened, right?  A:  Correct."); *id.* at 122 ("Q:  Isn't it true that sitting here today, you are not able to identify for the Court any particular disclosure that you claim you should have gotten . . . that you say you didn't get, isn't that correct? . . . A: Correct.").  Plaintiff was also unable, although he was asked repeatedly, to point to a specific billing error on any of his USAA account statements.  *E.g.*, *id.* at 26 ("A: It goes back to the billing errors.  Q: Name one. A: I can't.  Q: Name any of them.  A: I can't.  Q: Name all of the billing errors on which you relied in sending Exhibit 4.  A: I can't.").  Rather, Plaintiff simply printed, signed, and mailed the DRS-authored form letters to his creditors, including USAA SB, without any alteration, and without any assurance from

DRS that they had inspected his accounts for errors. *E.g.*, *id.* at 252-53 ("Q: And that's the case with all of these letters. You printed, signed and mailed them without making a single change, because that's what Debt Relief Services told you to do, isn't that right? A: Correct."); *id.* at 182-83 ("Q: You knew all along you were going to send those letters, right? A: Correct. Q: Regardless of what was on the statements, right? A: Correct. . . . Q: So the facts didn't matter. What mattered was getting these letters printed, signed and mailed, right? A: Correct."); *id.* at 156-161 ("Q: Again, this was sent to you before anyone from Debt Relief Services had any opportunity to look at anything pertaining to any of your accounts, right? A: Yes. Q: And yet, you accepted those form letters and you sent them on to all the credit card issuers, didn't you? A: Correct."). Finally, Plaintiff admitted that the letters were designed to lead creditors, including USAA SB, into committing violations of the TILA and FCBA. *E.g.*, *id.* at 269 ("Q: That is the point of these letters, to create violations that get you money. That's the point, right? A: Yes.").

To contravene Defendants' summary judgment evidence, Plaintiff offers only his own conclusory and wholly unsupported statements that he did, in fact, believe that there were errors in his account statements. For example, Plaintiff offers an affidavit, rather questionably signed well after his deposition and immediately preceding submission of his motion for partial summary judgment, averring that "I believe that I may not have been given all the disclosures which USAA was required to give to me at the time that my USAA account in question was opened. . . . When I sent the billing error notices on the account in question, I believed that there were billing errors in the statements . . .". Pl.'s Mot. Partial Summ. J., Ex. 1. Additionally, and in seeming contradiction of much of

the rest of his testimony, Plaintiff stated numerous times during his deposition that he thought there were billing errors on his statements. *E.g.*, Eicken Dep. 14-15 ("Q: Tell me why you wanted the bank's original bookkeeping entry.  A: Through my education, I thought there were billing errors.").  It has long been established that "mere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient, therefore, to defeat a motion for summary judgment." *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996).  Because Plaintiff's statements amount to little more than conclusory allegations, the Court doubts that Plaintiff has introduced enough evidence to overcome Defendants' motion for summary judgment on the issue of belief.  The Court need not rely on this ground, however, as it has already determined that Plaintiff's letters did not constitute valid notices of billing error because they were not timely submitted.

The Court is mindful that Congress enacted the TILA and FCBA to protect consumers from inaccurate, unfair, and predatory credit practices, and that "[c]onsistent with its purpose, the statute is meant to be construed liberally in favor of the consumer." *Fairley v. Turan-Foley Imports, Inc.*, 65 F.3d 475, 479 (5th Cir. 1995).  Additionally, precedent in this Circuit mandates strict enforcement of these statutes against creditors, in that "once [a] court finds a violation, no matter how technical, it has no discretion with respect to the imposition of liability." *E.g.*, *Grant v. Imperial Motors*, 539 F.2d 506, 510 (5th Cir. 1976).  The Court's opinion today does not undermine these policies in any way.  In the Court's view, the circumstances at hand – in which an obligor sent billing error "notices" complaining of charges well outside the allowed sixty-day time period, without possessing a belief that any errors actually existed, and as part of a larger effort to escape

his debt obligations and create liability on the part of the creditor – lie far beyond what the TILA and FCBA were intended to protect.  Further, neither party has identified any actual underlying billing error in Plaintiff's USAA account statements, no matter how technical.[7]

While the TILA and FCBA function to protect consumers, consumers in turn "have a responsibility not to use TILA as an 'instrument of harassment and oppression' against the lending industry."  *Rochon v. Citicorp Mortgage, Inc.*, No. 94-C-3326, 1996 WL 167056 (N.D. Ill. Apr. 5, 1996) (quoting *Kramer v. Marine Midland Bank*, 559 F. Supp. 273, 278 (S.D.N.Y. 1983) (internal citations omitted); *see also Sharp v. Ford Motor Credit Co.*, 452 F. Supp. 465, 468 (D.C. Ill. 1978) ("It appears to be all too easy, in the light of some reported cases, for courts to abdicate the realm of reality.  The required disclosures must be strictly required and enforced by the courts, but the courts should not condone or give credence to suits which attempt to subvert the Act into an instrument of harassment and oppression of the lending industry."); *Shields v. Valley Nat'l Bank of Arizona*, 56 F.R.D. 448, 451 (D.C. Ariz. 1971) ("The Truth-in-Lending Act has laudable purposes and should be strictly enforced by the Courts, but it should not be allowed to be used as a means of oppression or harassment or unjust enrichment.").

The Court also does not view its reading of the FCBA's "belief" requirement as imposing any significant burden on individual obligors.  Given the remedial nature of the TILA and the FCBA, any burden would be on creditors to come forward with significant, compelling evidence of the *absence* of a belief, as Defendants have done here.  Further,

---

[7] The fact that no underlying billing error has been identified distinguishes the instant case from several of the authorities cited by Plaintiff.  *See supra* n.5 (discussing the *Kurz* case); *see also Villanueva v. Motor Town,, Inc.*, 619 F.2d 632, 634 (7th Cir. 1980) (reversing district court's ruling that application of incorrect APR, even when difference in rate was miniscule, was only a *de minimis* error); *Grant*, 539 F.2d at 510 (imposing liability for failure to itemize and disclose certain fees).

the Court concurs with those authorities that would not punish an obligor for *incorrectly* believing that a billing error exists.  *See, e.g.*, *Gengo v. Target Nat'l Bank*, No. H-06-340, 2007 U.S. Dist. LEXIS 22946, at *30 (S.D. Tex. Mar. 13, 2007) ("The statute does not state that the consumer's assertion of a billing error must be correct in order to trigger the creditor's obligation to respond according to the statutory requirements."); *Belmont v. Assocs. Nat'l Bank (Delaware)*, 119 F. Supp. 2d 149 (S.D.N.Y. 2000) (finding that a creditor must respond to Section 1666 consumer inquiries "regardless of whether the consumer who sent the notice was correct in his belief that an error had been made.").[8] In short, the Court's ruling as to Plaintiff's lack of belief should be limited to a very narrow set of circumstances, in which a creditor uncovers substantial evidence demonstrating an obligor's lack of belief that a billing error actually exists, and the obligor is unable to produce competent summary judgment evidence to the contrary.[9]

Therefore, Defendants are entitled to summary judgment on Plaintiff's claims under the TILA, the FCBA, and Regulation Z, and Plaintiff should take nothing. However, the Court denies Defendants' request for judgment in the amount of Plaintiff's outstanding balance on his USAA account.  Defendants do not appear to have sought summary judgment on their counterclaims for breach of contract and unjust enrichment. Pursuant to the Court's rulings herein, Defendants may lawfully continue their efforts to collect Plaintiff's debt or to settle his account, but an award of judgment is as yet

---

[8] The Court does distinguish, however – which other courts appear not to have done – between a case where an obligor lacks any belief that a billing error exists, and a case where an obligor believes that there is an error, but is ultimately shown to be incorrect.

[9] Plaintiff argues that "proving a belief can often be impossible.  For example, how does one prove he believes in a god; or that he loves someone?  Typically one cannot."  The Court disagrees that it would be impossible to produce evidence demonstrating an obligor's belief that a billing error existed.  An obligor could produce account statements, receipts, or other documents, or at least submit deposition or affidavit testimony describing the chain of reasoning that led to his or her belief that an error existed.  In the instant case, however, Plaintiff is wholly unable to explain how he arrived at the conclusion that a billing error occurred, or that he had not received required disclosures.

unwarranted, and would be premature while Defendants' counterclaims pend. The parties are directed to confer on the issue of Plaintiff's outstanding balance and report any settlement to the Court within fourteen days of entry of this Memorandum and Order. If the parties are not able to achieve a resolution, the Court will set all remaining claims for prompt trial.

The Court also denies Defendants' request for attorneys' fees. Plaintiff is correct that TILA is not a fee-shifting statute, and the issue of fees will be deferred until all claims have proceeded to disposition, or settlement has been reached.

### 2. Plaintiff's Motion for Partial Summary Judgment

Plaintiff moves for partial summary judgment on the issue of liability under the FCBA. The Court has already determined that Defendants did not violate any provisions of the FCBA, and granted summary judgment to Defendants on those claims. Therefore, summary judgment must be denied to Plaintiff on his FCBA claims.

### III.     CONCLUSION

Defendants' Motion to Strike and Objections to Plaintiff's Summary Judgment Evidence is **DENIED.** Defendants' Motion to Strike Attempts to Change Deposition Testimony is **GRANTED IN PART, DENIED IN PART.** Defendants' Motion for Summary Judgment is **GRANTED IN PART, DENIED IN PART.** Plaintiff's Motion for Partial Summary Judgment is **DENIED.**

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 26th day of July, 2007.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

**TO INSURE PROPER NOTICE, EACH PARTY WHO RECEIVES
THIS ORDER SHALL FORWARD A COPY OF IT TO EVERY
OTHER PARTY AND AFFECTED NON-PARTY EVEN THOUGH
THEY MAY HAVE BEEN SENT ONE BY THE COURT.**